**RECORD NO. 13-2018**

# IN THE
# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

VALINDA STREATER,

INDIVIDUALLY AND AS GUARDIAN AD LITEM FOR MINOR OTHER J.G.,

*Plaintiff - Appellee,*

v.

MATTHEW WILSON,

IN HIS INDIVIDUAL AND OFFICIAL CAPACITY AS AN OFFICER OF THE
CHARLOTTE MECKLENBURG POLICE DEPARTMENT,

*Defendant - Appellant,*

and

CITY OF CHARLOTTE,

*Defendant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
AT CHARLOTTE

**OPENING BRIEF OF APPELLANT**

Daniel E. Peterson
R. Harcourt Fulton
Mark H. Newbold
OFFICE OF THE CITY ATTORNEY
600 East 4th Street
Charlotte, NC 28202
(704) 432-5397
dpeterson@charlottenc.gov
cfulton@ci.charlotte.nc.us
mnewbold@cmpd.org

October 31, 2013                          *Counsel for Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. _13-2018_       Caption: _Jeffrey Green v. City of Charlotte, et al._

Pursuant to FRAP 26.1 and Local Rule 26.1,

Matthew Wilson
(name of party/amicus)

who is _____the appellant_____, makes the following disclosure:
           (appellant/appellee/amicus)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.  Does party/amicus have any parent corporations?                           ☐ YES ☑ NO
    If yes, identify all parent corporations, including grandparent and great-grandparent
    corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
    other publicly held entity?                                              ☐ YES ☑ NO
    If yes, identify all such owners:

- 1 -

4.   Is there any other publicly held corporation or other publicly held entity that has a direct
     financial interest in the outcome of the litigation (Local Rule 26.1(b))?   ☐ YES ☑ NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)   ☐ YES ☑ NO
     If yes, identify any publicly held member whose stock or equity value could be affected
     substantially by the outcome of the proceeding or whose claims the trade association is
     pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?   ☐ YES ☑ NO
     If yes, identify any trustee and the members of any creditors' committee:

Signature: _____          Date: 8/26/2013

Counsel for: Matthew Wilson

## CERTIFICATE OF SERVICE
*****************************

I certify that on ___August 26, 2013,___ the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

Fred W. DeVore, III
F. William DeVore, IV
DeVore Acton & Stafford, PA
438 Queens Road
Charlotte, NC  28207
fdevore@devact.com
will@devact.com

_____          8/26/2013
        (signature)                    (date)

**<u>TABLE OF CONTENTS</u>**

CORPORATE DISCLOSURE

TABLE OF AUTHORITIES...........................................ii

STATEMENT OF JURISDICTION......................................1

STATEMENT OF THE ISSUES.......................................2

STATEMENT OF THE CASE.........................................3

STATEMENT OF FACTS............................................6

SUMMARY OF ARGUMENT..........................................11

ARGUMENT.....................................................14

I.    A motion for judgment as a matter of law on the basis of
      qualified immunity is renewed *de novo by the Court,
      testing for the objective reasonableness of an officer's
      conduct, with the evidence construed in a light most
      favorable to the plaintiff-appellee*.......................14

II.   Qualified immunity is a two prong test designed to
      protect the objectively reasonable actions, even
      mistaken actions, of government officials..................15

III.  Given the totality of the circumstance confronting
      Defendant-Appellant, a reasonable mistaken perception on
      the distance between he and Plaintiff-Appellee does not
      negate the objecti ve reasonableness of his use of force..17

IV.   Defendant-Appellant's conduct was objectively reasonable
      in view of the lack of clearly established law as to the
      specific, relevant, and particularized right in question..34

CONCLUSION...................................................42

CERTIFICATE OF COMPLIANCE....................................44

CERTIFICATE OF FILING AND SERVICE............................45

## <u>TABLE OF AUTHORITIES</u>

### CASES

Anderson v. Russell,
    247 F.3d 125 (4th Cir. 2001)...........................28, 33

Ashcroft v. al-Kidd,
    131 S. Ct. 2074, 179 L. Ed. 2d 1149 (U.S. 2011).......15, 16

Bailey v. Kennedy,
    349 F.3d 731 (4th Cir. 2003).......................39, 40, 41

Brosseau v. Haugen,
    543 U.S. 194, 125 S. Ct. 596, 160 L. Ed. 2d 583
    (2004).................................................35-38

Gooden v. Howard County,
    954 F.2d 960 (4th Cir. 1992)...................25, 30, 31, 33

Graham v. Connor,
    490 U.S. 386, 109 S. Ct. 1865, 104 L. Ed. 2d 443
    (1989)................................................*Passim*

Harlow v. Fitzgerald,
    457 U.S. 800, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982).....16

Hill v. Crum,
    727 F.3d 312 (4th Cir. 2013)..................14, 16, 34, 35

Jones v. Buchanan,
    325 F.3d 520 (4th Cir. 2003).......................39, 40, 41

Maciariello v. Sumner,
    973 F.2d 295 (4th Cir. 1992)..............................11

Malley v. Briggs,
    475 U.S. 335, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986).....11

Mitchell v. Forsyth,
    472 U.S. 511, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985)......2

Pearson v. Callahan,
    555 U.S. 223, 129 S. Ct. 808, 172 L. Ed. 2d 565
    (2009).................................................15, 17

ii

Pena v. Porter,
    316 Fed.Appx.303(4th Cir. 2009)........................32, 33

Rainey v. Conerly,
    973 F.2d 321 (4th Cir. 1992)...........................31, 32

Sigman v. Town of Chapel Hill,
    161 F.3d 782 (4th Cir. 1998)...........................*passim*

Slattery v. Rizzo,
    939 F.2d 213 (4th Cir. 1991)...........................29, 33

Tennessee v. Garner,
    471 U.S. 1, 105 S. Ct. 1694, 85 L. Ed. 2d 1
    (1985).............................................36, 37, 38

Wilson v. Layne,
    526 U.S. 603, 119 S. Ct. 1692, 143 L. Ed. 2d 818
    (1999)................................................34, 35

**STATUTES**

42 U.S.C. § 1983.............................1, 3, 4, 13, 15, 36
28 U.S.C. § 1291.................................................1
28 U.S.C. § 1331.................................................1

**RULES**

Fed. R. Civ. P. 50(b).......................................4, 14

**UNITED STATES CONSTITUTION AMENDMENTS**

US Constitution Amend. IV..................................*Passim*

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 13-2018

VALINDA STREATER, as Guardian ad Litem for "J.G.",

Plaintiff-Appellee,

v.

MATTHEW WILSON,

Defendant-Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA

**STATEMENT OF JURISDICTION**

This appeal is taken from an appealable final order of the United States District Court for the Western District of North Carolina (hereinafter referred to as "the District Court") denying Defendant-Appellant's Motion for Judgment as a Matter of Law on the basis of his being entitled to qualified immunity from this matter. The District Court has original jurisdiction, pursuant to 28 U.S.C. § 1331, to resolve a question of federal law. Plaintiff-Appellee brought this lawsuit including a claim made under 42 U.S.C. § 1983 against Defendant-Appellant-- a police officer-- in his individual capacity, alleging that the officer used excessive force in an encounter with Plaintiff-Appellee.

1

The Circuit Court has jurisdiction over this appeal because, pursuant to 28 U.S.C. § 1291, though final judgment has not been entered in the case, an order denying qualified immunity is immediately appealable when the disposition turns on a question of law. *See*, *e.g.*, <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).

The subject order was signed by the Honorable Max O. Cogburn on August 12, 2013, and thereupon filed. That same day, counsel for Defendant-Appellant entered both a verbal notice of appeal in open court and timely filed a written Notice of Appeal. *See*, Joint Appendix, 395-404.

## STATEMENT OF THE ISSUES

I.   Whether the District Court erred by denying qualified immunity to Defendant-Appellant where the use of force was objectively reasonable given the totality of circumstances reasonably perceived by the officer?

II.  Whether the District Court erred by denying qualified immunity to Defendant-Appellant where his conduct was objectively reasonable in view of the lack of clearly established law as to the specific right in question?

2

**STATEMENT OF THE CASE**

This lawsuit was originally filed in Mecklenburg County Superior Court on September 27, 2011, alleging state tort claims against Defendant-Appellant Matthew Wilson and Defendant City of Charlotte for negligence, gross negligence, trespass by a public officer, and intentional infliction of emotional distress. *See*, Joint Appendix, 17-24. Plaintiff-Appellee also included claims brought under 42 U.S.C. § 1983 against both defendants, claiming that Defendant-Appellant unreasonably violated the Fourth Amendment rights of Plaintiff-Appellee and that Defendant City of Charlotte failed to adequately train its police officers on the proper use and application of deadly force. J.A., 22. The only remaining claim in this lawsuit is the individual capacity claim brought against Defendant-Appellant under 42 U.S.C. § 1983 and for which he is entitled to qualified immunity. Thus, resolution of this claim will be dispositive of the lawsuit.

This case was brought to trial before the Honorable Max O. Cogburn beginning on April 9, 2013. J.A., 8-9. At the conclusion of Plaintiff-Appellee's case-in-chief, there appearing to be no material facts remaining in dispute, Defendant-Appellant Wilson and Defendant City of Charlotte moved for judgment as a matter of law. J.A., 315-317. In this motion, Defendant-Appellant asserted qualified immunity, or 'good faith' immunity, as preserved in his Answer to the suit.

3

J.A., 36, 315.   That motion was briefed by Defendant-Appellant, heard in open court and denied.   J.A., 8-9, 320-328.

Subsequently, a stipulation of dismissal was entered into by the parties, dismissing the claims against Defendant City of Charlotte and all claims against Defendant-Appellant with the exception of Plaintiff-Appellee's § 1983 claim against him in his individual capacity. *See*, J.A. 9.

At the conclusion of evidence, Defendant-Appellant again moved for judgment as a matter of law on the basis of qualified immunity.   This was denied in open court.   After extensive deliberations, the jury reported back to the District Court that they were unable to agree on a verdict.   The District Court declared a mistrial on April 12, 2013. *See*, id.

Consistent with the provisions of Rule 50(b) of the Federal Rules of Civil Procedure, Defendant-Appellant renewed its Motion for Judgment on the Pleadings within twenty eight days after the jury was discharged, filing said motion and a memorandum of law supporting it on May 9, 2013.   J.A., 9, 351-353.   It is from this motion asserting qualified immunity that this appeal follows.   The following day, Plaintiff-Appellee filed a renewed motion for judgment as a matter of law.   J.A. 9.

4

A new trial was set to begin on August 12, 2013. The District Court noticed a motion hearing for both parties' renewed motions for judgment as a matter of law to be held on August 7, 2013. J.A., 11. The District Court heard arguments on Defendant-Appellant's motion in open court and took it under advisement. J.A., 13, 354-374. After postponing the impaneling of a jury, the Court held a brief hearing and entered an order on August 12, 2013, denying Defendant-Appellant's motion. J.A., 14, 375-401.

The District Court denied qualified immunity on the basis that, taking the facts in a light most favorable to Plaintiff-Appellee, (i) the right to be free from the use of deadly force when not posing an imminent threat to the officer was clearly established and (ii) a jury could find that Defendant-Appellant's use of force was objectively unreasonable. J.A., 387-391. Therefore, the District Court concluded, it could not allow Defendant-Appellant's motion on the basis of qualified immunity.

In open court on August 12, 2013, counsel for Defendant-Appellant verbally noticed an intention to take this appeal and, that day, subsequently filed a notice of appeal. J.A., 402-404.

5

## STATEMENT OF FACTS

In its Order, the District Court discusses the testimony of each of the plaintiff's witnesses, and in doing so, captures the relevant facts in regard to this appeal. *See* Joint Appendix, 377-387. Defendant-Appellant will lay forth this factual background briefly in narrative form.

At the time of this incident, Plaintiff-Appellee was fifteen years old and lived with his mother, Valinda Streater, his maternal grandparents, and Ms. Streater's boyfriend on Brandie Glen Road in Charlotte, North Carolina. J.A., 378-379. On October 16, 2010, Ms. Streater told her boyfriend, Bruce Jenkins, that she did not want him in her house anymore. J.A., 378. After Ms. Streater returned home from dinner with her parents, Mr. Jenkins rapidly knocked on the door, kicked the door in, and stabbed her with a large knife in the arm and abdomen. Ms. Streater fled out of the house, up the street. Mr. Jenkins pursued her on foot, but was blocked by a vehicle aiding Ms. Streater's escape. Ms. Streater arrived at a neighbor's house and asked them to call the police. Mr. Jenkins retreated, and Ms. Streater testified that he left the scene in his car before the police arrived. Officer Wilson was the first officer to arrive on the scene, approximately ten minutes later, with another officer arriving shortly thereafter. Id.

6

During the attack, Plaintiff-Appellee was visiting with friends in the same neighborhood, but in the opposite direction his mother had fled from his house. J.A., 137:5-17, 141:7-10. He learned his mother had been stabbed when a friend-- a resident of the house to which Ms. Streater had fled-- called him. Plaintiff-Appellee walked down the street to his home "screaming and yelling" with a friend named Michael Leath. They found broken windows, a broken door and other signs of struggle. Angry, he grabbed a knife from the kitchen and began walking quickly up the street towards where he believed the assailant Bruce Jenkins was located. J.A., 141:7-18.

Before arriving at the scene, Charlotte-Mecklenburg Police Officer Matthew Wilson was advised by dispatch that a female victim had been stabbed and that the subject was still on the scene. J.A., 41:19-24, 384. Officer Andrew Helms arrived at approximately the same time. J.A., 51:18-20, 384. After identifying Ms. Streater as the stabbing victim, Officer Wilson learned that she was concerned about her elderly parents back at the house. J.A., 55:2-5, 116:6-21, 384. She testified that she told Officer Wilson that the assailant had already left, but Officer Helms testified it was he that she told that to, after Officer Wilson had left to go check on her parents. J.A., 115:4-116:2, 276:2-20.

7

Officer Wilson had started up the street towards the known scene of a domestic stabbing, leaving behind him the victim-- Ms. Streater-- another officer and bystanders.  J.A., 72:11-74:14, 193, 277:1-9.  Starting at about fifty feet away, Officer Wilson testified that he observed two individuals approaching "quickly," one holding a shiny object in his right hand and cursing.  J.A., 63:8-65:4, 75:3-12, 385.  As the gap between them closed, Officer Wilson identified the object in Plaintiff-Appellee's right hand to be a knife.  Id.  It is uncontroverted that he withdrew his pistol and repeatedly ordered the suspect-- again, carrying the same type of weapon that was used to stab the victim who was now located behind him along with other bystanders-- to first "drop the weapon" and then "drop the knife."  J.A., 65-66, 385-386.

None of his commands were to any avail; indeed, Plaintiff-Appellee continued to advance and to at least one of these commands, Plaintiff-Appellee looked directly at Officer Wilson and shouted, "Nah Fuck that," or some close variation.  J.A., 79:2-9, 347-348.  Even Plaintiff-Appellee's friend, Michael Leath, urged him to comply with Officer Wilson.  J.A., 347-348.  After repeated commands failed and Officer Wilson estimated Plaintiff-Appellee to be within twenty feet, believing the non-compliant, aggressive, knife-wielding individual to now be an

imminent threat to he and others, Officer Wilson-- unable to retreat for the same reasons-- made the split-second decision amid the chaos to fire two shots, paused for two or three seconds, reassess, and as Plaintiff-Appellee bladed and squared towards him, he fired two more shots.  J.A. 72:11-81:17, 386-387

During the confrontation, Ms. Streater shouted something to the effect of, "Don't shoot, that's my son!"  J.A., 119:6-11, 192:13-25, 284:14-19, 379.  She testified that she was only a few feet behind Officer Wilson at this point.  J.A., 119:18-23, 379.  Officer Helms, in charge of managing the victim and bystanders as Officer Wilson moved towards the house, testified that she was on the driveway at the time, "a house or two down in the middle of the street…probably a hundred feet or more."  J.A., 284:14-285:1.  April Dixon, one of the residents of the home to where Ms. Streater had fled, testified that she shouted this while on the ground on the driveway.  J.A., 193:1:-5.  In any event, there is no evidence that Officer Wilson heard this exclamation. In fact, Plaintiff-Appellee testified that he did not hear his mother's alleged urging to drop the knife.  J.A., 118:21-24, 158:1-2.

Plaintiff-Appellee was struck by some combination of the four shots, but was nonetheless able to flee behind houses until Defendant-Appellant captured him.  J.A., 97:1-100:16, 150:14-

9

151:1. Defendant-Appellant urged him to tell him where the knife was to prevent him from rolling Plaintiff-Appellee on top of the knife and to prevent Plaintiff-Appellee from delivering the knife as he was being handcuffed. Id. At some point during the exchange, Officer Wilson learned that Plaintiff-Appellee had disarmed by lateraling the knife to his side during the encounter in the street. 158:3-19.

Emergency medical personnel treated Plaintiff-Appellee and transported him to a local hospital. Officer Wilson was taken to the headquarters of the Charlotte-Mecklenburg Police Department ("CMPD") for questioning. Hours later, he returned to the scene voluntarily "as part of a crime scene investigation, where he assisted crime scene investigators in determining where he actually stood when he fired and where he believed the minor plaintiff was located." J.A., 103:16-22, 387. The distance of Officer Wilson's estimate was then measured by crime scene investigators. "The distance was approximately 32 feet rather than the 20 feet Officer Wilson testified he believed was between the two," at the time of the encounter. J.A., 387.

10

**SUMMARY OF ARGUMENT**

Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986).

It protects law enforcement officers from "bad guesses in gray areas" and ensures that they are liable only "for transgressing bright lines." Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992). The crux of this case is the distance at which Defendant-Appellant made the decision to fire at Plaintiff-Appellee. Taking the facts in a light most favorable to Plaintiff-Appellee, that distance was 31.9 feet.

Officer Wilson perceived the knife-wielding Plaintiff-Appellee to be within twenty feet of him. For purposes of this motion, the Court must assume that distance perception to have been a mistake-- a mistake of less than five yards. However, qualified immunity should not be denied to an officer that makes a reasonable misperception of five yards as an individual armed with a knife approaches him, a stabbing victim, another officer, and bystanders. Qualified immunity should not be denied to an officer that makes a reasonable misperception of five yards as that same individual continues to approach despite several commands to drop the knife, aggressively refuses the officer's commands, and has another individual following near him.

11

Holding otherwise, as the District Court did in this case, requires that, given the evidence of distance at trial, Officer's Wilson on-the-scene perceived distance between he and Plaintiff-Appellee was objectively unreasonable to fire from.

Rather, the full inquiry results in *assuming* that the parties were 31.9 feet apart, considering the evidence on the record, and then asking whether Officer Wilson's assumed mistake in perception was itself unreasonable and that, therefore, the resultant use of deadly force was unreasonable. Defendant-Appellant contends that his mistake in perception was reasonable and that, thus, his use of deadly force must be viewed as objectively reasonable as a matter of law.

Several cases from this Circuit will be offered in the argument made below to support the contention that mere mistakes in perception do not yield a loss of qualified immunity. Indeed, it is evident from the relevant case law that these are the types of mistakes that the Court has protected in its jurisprudence over the course of time. Moreover, the cases wherein qualified immunity is denied on the basis that a jury *could* find the officer's conduct as objectively unreasonable have been when there are fundamental differences in what occurred on the ground. This case is not like the latter-described category. Rather, Plaintiff-Appellee seeks to hold

12

Defendant-Appellant liable for excessive force in the context of a narrow misperception in a chaotic scene.

Finally, Defendant-Appellant's conduct was objectively reasonable based on the lack of clearly established law with respect to the *specific* circumstances confronting him on the night in question. In defining the right at stake, it is not sufficient to rely on the broad principles identified in the touchstone cases of Fourth Amendment excessive force claims under § 1983. The right at stake must be defined more precisely so as to give law enforcement officers fair notice on the limits of their authority to use force. The cases cited by the District Court relate to usages of force upon the unarmed and, in one case, the detained.

There is no case law from the U.S. Supreme Court, the Fourth Circuit Court of Appeals, and the North Carolina Supreme Court that could have put Officer Wilson on sufficiently specific notice that his conduct on the night in question was proscribed. The only case law that arguably addresses the factual scenario confronted by Officer Wilson on the night in question yields both a favorable result and favorable conclusion for the defendant-officer. In any event, Officer Wilson cannot be liable for his conduct on the night in question absent clearly established law holding otherwise.

13

ARGUMENT

I.  **A motion for judgment as a matter of law on the basis of qualified immunity is renewed *de novo* by the Court, testing for the objective reasonableness of an officer's conduct, with the evidence construed in a light most favorable to the plaintiff-appellee.**

A district court's denial of a motion brought under Fed. R. Civ. P. 50(b) is reviewed *de novo* by the Court.  *See*, Hill v. Crum, 727 F.3d 312, 321 (4th Cir. 2013).

Specifically applied to cases of qualified immunity, facts are *not* construed in a light most favorable to a plaintiff by only accepting facts favorable to the plaintiff as true at the exclusion of facts unfavorable to the plaintiff.  Rather, the Court asks: 'in light of the evidence most favorable to the plaintiff, was the officer's perception of the circumstances confronting him a reasonable perception?'  *See*, *e.g.*, Sigman v. Town of Chapel Hill, 161 F.3d 782 (4th Cir. 1998) (where the Court considered the shooting officer's perspective in light of three affidavits offered by the plaintiff to attempt to create an issue of fact for a jury; the Court concluded that the officer's perspective was objectively reasonable even considering the three affiants' perspective).  In other words, the officer's perception is never substituted in qualified immunity analysis simply because there is a disagreement of fact between the parties; his perception is tested for reasonableness

14

against the backdrop of evidence construed in a light most favorable to the plaintiff. *See*, *e.g.*, <u>id</u>., at 787 ("[I]t will nearly always be the case that witnesses differ over what occurred. That inevitable confusion, however, need not signify a difference of triable fact.")

## II. Qualified immunity is a two prong test designed to protect the objectively reasonable actions, even mistaken actions, of government officials.

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects all but the plainly incompetent or those who knowingly violate the law."

<u>Ashcroft v. al-Kidd</u>, 131 S.Ct. 2074, 2085, 179 L.Ed.2d 1149 (U.S. 2011). Moreover, "[t]he protection... applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." <u>Pearson v. Callahan</u>, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

To overcome qualified immunity from section 1983 claims, a plaintiff must prove that a governmental official, acting under color of law, "violate[d] [the plaintiff's] clearly established

statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Inherent in that axiomatic statement are two questions examined by the courts in each claim of qualified immunity: (i) whether the defendant has violated a statutory or constitutional right of the plaintiff and (ii) whether the defendant's conduct was nonetheless "objectively reasonable in view of the clearly established law at the time of the alleged event." *Hill v. Crum*, 727 F.3d 312, 321 (4th Cir. 2013).

This case warrants the application of qualified immunity. Given the tense and chaotic factual backdrop to this case, described *supra*, Officer Wilson is entitled to the 'breathing room' the Supreme Court speaks of in *al-Kidd*. The evidence in this case shows that, as a matter of law, Officer Wilson acted reasonably. Even if the Court decides that he did act unreasonably-- or, as the District Court decided, that a jury *could* decide that he acted unreasonably-- the fact-specific right he would have purportedly violated was an open legal question as of the evening of October 8, 2009. In other words, Officer Wilson is protected by qualified immunity because he is neither "plainly incompetent' nor did he "knowingly violate the law." *al-Kidd*, 131 S.Ct. 2074, 2085.

16

The Court is free to consider whichever prong of qualified immunity that it deems appropriate "in light of the circumstances in the particular case at hand." <u>Pearson v. Callahan</u>, 555 U.S. 223, 236, 129 S. Ct. 808, 818, 172 L.Ed.2d 565 (2009). Defendant-Appellant will proceed in this brief from the traditional order, beginning with the constitutional question, and then proceeding to whether the question was clearly established. If either prong of qualified immunity is settled in favor of the police officer, he is entitled to judgment as a matter of law.

**III. Given the totality of the circumstance confronting Defendant-Appellant, a reasonable mistaken perception on the distance between he and Plaintiff-Appellee does not negate the objective reasonableness of his use of force.**

"The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." <u>Graham v. Connor</u>, 490 U.S. 386, 396, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989).

With regard to law enforcement use of force cases brought under the Fourth Amendment, that same 'totality-of-the-circumstances' standard-- *i.e.*, "objective reasonableness standard"-- finds its touchstone in <u>Graham v. Connor</u>:

17

Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application...however, its proper application requires careful attention to the *facts and circumstances of each particular case*, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

490 U.S. 386, 396, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989) (emphasis added) (internal citations and quotations omitted). Underscoring that the proper examination of an officer's conduct in these types of cases is ultimately a balancing inquiry, the Court goes on to caution that "[t]he Fourth Amendment is not violated by an arrest based on probable cause, even though the wrong person is arrested...nor by the mistaken execution of a valid search warrant on the wrong premises." Id., (internal citations omitted).

It is undisputed that Plaintiff-Appellee was not Ms. Streater's attacker that evening. However, Officer Wilson's conduct that evening was "objectively reasonable in light of the facts and circumstances confronting [him]..." 490 U.S. 386, 397. "In determining the reasonableness of the manner in which a

seizure is effected, [the Court] must balance the nature and quality of the intrusion on the individual's Fourth Amendment rights against the importance of the governmental interests alleged to justify the intrusion." Scott v. Harris, 550 U.S. 373, 383, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007).

In Scott, a defendant-officer terminated a high speed chase by ramming the car in a specific manner so as to cause it to spin and stop. 550 U.S. 372, 375. As a result of the maneuver, the suspect's vehicle "ran down an embankment, overturned, and crashed," making the suspect a quadriplegic. Id. The Supreme Court reversed the Eleventh Circuit, finding qualified immunity and holding that the conditions by which deadly force may be used are not governed by "a magical on/off switch that triggers rigid preconditions…" 550 U.S. 372, 382. The officer there had "the paramount governmental interest in ensuring [the] safety" of him and others. Id. Additionally relevant to the Court's analysis was the culpability of the plaintiff "plac[ing] himself and the public in danger…" by his unlawful conduct. Id., at 384. "By contrast, those who might have been harmed had [the officer] not taken the action he did were entirely innocent… "We think the police need not have taken that chance and hoped for the best." Id., at 384-85.

Similarly, in this case, Officer Wilson had the paramount interest of ensuring the safety of himself and others on the scene. As unfortunate as the circumstances of that evening are, Plaintiff-Appellee aggressively refused orders to drop the weapon, and was either armed or recently armed at the time of the shooting; he placed himself and the public in danger. *See*, *e.g.*, J.A., 347-348. Officer Wilson testified that "stepping back" was not an option because of the presence of "[t]he victim that had been stabbed behind me…also Officer Helms, to include another male, another female, and a young man that was standing in the doorway." J.A., 81. Just as the officer in Scott, Officer Wilson "need not have taken that chance and hoped for the best."

Though the District Court distinguishes Sigman v. Town of Chapel Hill from the case at bar, the same result here should follow, given the qualified immunity analysis by this Court yielding from similar material facts. 161 F.3d 782 (4th Cir. 1998). In Sigman, the officer stated that the suspect was shot as he approached the officers with a knife and kept advancing even after the officers told him to drop the knife. Id., at 785. Three witnesses filed affidavits stating that the suspect had his hands raised and did not have a knife in his hands at the time he was shot and killed by one of the three officers

engaged with him on the scene.  Id., at 786.  Sigman's estate
claimed that the shooting officer "acted unreasonably [under the
Fourth Amendment] when he shot Sigman while he was about 15 feet
away."  Id., at 785.  Both the District Court and the Fourth
Circuit found that the officer was entitled to qualified
immunity.

On appeal, Sigman contended summary judgment was
inappropriate because:  (1) there was a factual dispute as to
whether the suspect had a knife in his hand when he was shot;
(2) there was a dispute about whether the officer's perception
that Sigman had a knife was reasonable; and (3) there was a
factual dispute as to whether Sigman was a threat to the officer
when he was shot.  161 F.3d 782, 786.

The Fourth Circuit found the officer's actions were
reasonable under the Fourth Amendment.  Contrary to the District
Court's view that Sigman is materially distinguishable from the
facts of this case, Defendant-Appellant contends that the
conclusion of the Court in Sigman informs his assertion of
qualified immunity here.  In its opinion, the Sigman court held:

[The shooting officer] acted on the perception that Sigman
had a knife in his hand.  When an officer is faced with a
split-second decision in the context of a volatile
atmosphere about how to restrain a suspect who is

21

dangerous, who has recently-- and potentially still is-- armed, and who is coming toward the officer despite officers' commands to halt, we conclude that the officer's decision to fire is not unreasonable.

161 F.3d 782, 788.

Rather than the distance at issue being a material distinguishing factor between this case and Sigman, it is that Officer Wilson was *additionally* confronted with being at a known scene of a stabbing; in other words, there was an objective reason to believe that the suspect approaching with a large knife had already stabbed one person that evening, unlike the factual circumstances in <u>Sigman</u>. As such, a reasonable officer would believe that the person approaching was an imminent threat to the officer, Ms. Streater and innocent bystanders.  As the "severity of the crime at issue" is another factor in the totality of circumstances for the officer to consider, this fact only bolsters Officer Wilson's objectively reasonable belief that Plaintiff-Appellee was an imminent threat at those exact moments.  See, <u>Graham</u>, 490 U.S. 386, 396.  This is not a situation where an officer is asking the Court to hold that it is objectively reasonable for him to shoot when "a man has a knife and he's thirty something feet away and he doesn't drop it."  J.A., 357:2-5.  It is indisputable that Officer Wilson

22

understood that, at some distance, Plaintiff-Appellee was not an imminent threat, but once he perceived him to be within twenty feet, such an assessment is objectively reasonable. *See*, *e.g.*, J.A., 74:15–75:2, 78:17–80:9.

Officer Wilson acted on the objective perception that Plaintiff-Appellee had a knife in his hand had been approaching "quickly," behaving agitated, and having bladed towards him. J.A., 74:21–76:7, 78:22–79:9. Indisputable facts establish a tense, rapidly changing, and volatile atmosphere in which Officer Wilson, just as in Sigman, had to make a split-second decision about how to restrain a suspect who is dangerous, who was recently-- and potentially still was-- armed, and who was approaching toward him, a stabbing victim, another officer, and civilian bystanders despite his commands to drop the weapon. Id.

The District Court here disagrees, concluding that, "had it been faced with the facts presented in Sigman would have also granted qualified immunity," but that this was not such a case. J.A., 384. Rejecting application of Sigman to this case, the District Court observed that, "[i]n this case, the minor plaintiff was more than twice the distance, was not threatening to kill the officer, and had arguably stopped his advance." Id. However, had the Sigman court concluded, for purposes of

23

qualified immunity, that the three affidavits submitted by the estate were the appropriate facts to apply, similar criticisms would have arisen as to the officers.

According to the estate's affidavits, Mr. Sigman was "three steps from the front door" when he was shot. 161 F.3d 782, 786. He had "come out of the house, with his hands raised... they could clearly see Mark Sigman's hands and that he had nothing in them...Mark Sigman represented no threat of any kind to officer [sic] and that the officer shot him for no reason." Id. According to the Court's opinion, "[Sigman] took a number of steps towards Officer Riddle. Riddle, and all of the officers at the scene, perceived that Sigman was holding a knife as he moved towards Officer Riddle." Id., at 787 (emphasis added).

The Court in Sigman did not accept that there were specific disagreements in fact as material to the legal question; instead, the Court viewed the facts in a light most favorable to the estate and concluded that, despite the factual dispute between the officers and the affiants, "[w]hat matters is whether the officers acted reasonably upon their ports *available to them* and whether *they* undertook an objectively reasonable investigation with respect to that information in light of the exigent circumstances *they faced*." Id., at 787 (emphasis in

24

original), *quoting*, <u>Gooden v. Howard County</u>, 954 F.2d 960, 965 (4th Cir. 1992) (en banc).

In its Order, the District Court accepts as true that Plaintiff-Appellee and Defendant-Appellant were approximately thirty-two feet apart at the time of Officer Wilson's use of force and that this distance was the basis for denying qualified immunity:

> *While Officer Wilson testified that the minor plaintiff was only 20 feet away at the time he fired, the measurements on the ground as determined by the CMPD indicate that the minor plaintiff was 32 feet away from defendant when the shots were fired.* At that distance, the officer was arguably not faced with [a] 'split-second decision' the Chapel Hill officers faced in <u>Sigman</u> as the potential threat to the officer's safety and the safety of others was more than double the distance. Indeed the expert evidence presented at trial indicated that *had* the minor plaintiff decided to run at the officer with the knife starting at 32 feet, the officer would have multiple opportunities to stop such a charge, especially where as here the officer already had his weapon drawn, he had taken an A-frame position, and aimed his weapon at the minor plaintiff.

25

J.A., 384. The distance of thirty-two feet is the critical factor for the District Court in its denial of qualified immunity. The Court assumes that Plaintiff-Appellee was in fact 32 feet away at the time of the encounter. The Court concludes that, based on the evidence presented at trial cast in a light most favorable to Plaintiff-Appellee, a jury could find that it was objectively unreasonable for Defendant-Appellant to fire at Plaintiff-Appellee from thirty-two feet away, who was armed with a knife, both actively and audibly incompliant, and-- besides approaching the officer-- was approaching a stabbing victim and bystanders. J.A., 72:11-79:25.

This conclusion demands the premise that Officer Wilson's on-the-scene assessment of the imminence of the threat was unreasonable. Namely, it requires that, given the evidence of distance at trial, Officer's Wilson on-the-scene perceived distance between he and Plaintiff-Appellee was objectively unreasonable to fire from. The Order of the District Court is silent as to any assessment on whether Defendant-Appellant's on-the-ground, at the moment perception was in fact objectively reasonable.

As the encounter was happening, Officer Wilson testified that he estimated Plaintiff-Appellee to be within twenty feet of him as he approached, ignoring his commands, with a companion

behind him.  During trial, besides Officer Wilson's on-the-scene perception, there were two other sources of evidence as to the distance between Defendant-Appellant and Plaintiff-Appellee at the time of the shooting-- (i) the measurement between the point where Officer Wilson was standing and where he, hours after the incident, estimated Plaintiff-Appellee to be standing (which was subsequently measured by CMPD to be approximately 32 feet); and (ii) the knife being located by crime scene investigators approximately halfway between the estimate made by Officer Wilson hours after the incident (approximately 16 feet).[1]  J.A., 293:15-22, 313:23-314:9.

The inquiry does not stop at concluding, in a light most favorable to Plaintiff-Appellee, that the parties were 31.9 feet apart and that, therefore, (i) Sigman does not demand the same result in this case and (ii) a jury could have found Officer Wilson's choice to fire to be unreasonable.  This is the

---

[1] Plaintiff-Appellee testified verbally, and demonstrated in open court, that he lateraled the knife to his left side.  J.A., 158:3-18.  In other words, according to Plaintiff-Appellee's own testimony, he did not throw the knife forward.  CSI Nora Beamon testified that Officer Wilson voluntarily participated in a walk-through several hours after the incident wherein he made the estimate of Plaintiff-Appellee's position and the point between where he was standing and where he estimated Plaintiff-Appellee to be standing was 31.9 feet.  J.A., 293:15-22.  Crime scene investigators located the knife in a grassy planting strip beside a mailbox about halfway between where Officer Wilson had been standing and where he had estimated Plaintiff-Appellee to be standing.  J.A., 313:23-314:9.

analysis of the District Court and the position urged to date by Plaintiff-Appellee. Rather, the full inquiry results in *assuming* that the parties were 31.9 feet apart, considering the evidence on the record, and then asking whether Officer Wilson's assumed mistake in perception was itself unreasonable and that, therefore, the resultant use of deadly force was unreasonable. Defendant-Appellant contends that his mistake in perception was reasonable and that, thus, his use of deadly force must be viewed as objectively reasonable as a matter of law.

Reasonable mistakes in perception by officers are the very essence of liability that qualified immunity is designed to protect against.

A mistaken perception of approximately five yards, in the context of a chaotic and developing scene, should not expose a police officer to liability. "The Fourth Amendment does not require omniscience...Officers need not be absolutely sure... of the nature of the threat or the suspect's intent to cause them harm-- the Constitution does not require that certitude precede an act of self protection." Anderson v. Russell, 247 F.3d 125, 132 (4th Cir. 2001). In that case, the defendant-officer received information that the plaintiff was carrying a gun. Id., at 128. The officer ordered the suspect to halt and raise his hands. The suspect initially complied but then lowered them

"in an attempt to reach into his back left pocket to turn off his Walkman radio." Id. A witness to the incident testified at trial that, "although [the plaintiff] was lowering his hands, he was lowering them slowly, and [the plaintiff's] hands 'were still around head level when he was shot.'" Id., at 130. Despite this testimony that the officer shot too soon and despite the fact that the plaintiff was not in-fact armed, the Court held that the officer was entitled to qualified immunity.

Similarly, in Slattery v. Rizzo, the defendant-officer observed the plaintiff-suspect with his hand around an object just out of the officer's view. 939 F.2d 213, 215 (4th Cir. 1991). After the plaintiff failed to comply with his commands to raise his hands and, rather, turned towards the officer, the officer shot him in the face believing him to be armed with a deadly weapon. However, in fact, the plaintiff was gripping a beer bottle. This Court, reversing the District Court, held that "a reasonable officer could have had probable cause to believe that the [plaintiff] posed a deadly threat and therefore would be authorize to use deadly force. Therefore, we hold that [the officer] was entitled to qualified immunity." Id., at 216-17.

Qualified immunity for mistakes in police officer perception is not confined to whether a suspect is armed or not.

29

In Gooden v. Howard County, Md., officers responded to a call for service in relation to purported screaming and yelling from a particular apartment-- the second such complaint in as many weeks. 954 F.2d 960, 962-64 (4th Cir. 1992) (en banc). After interviewing both the resident of the complained of apartment and the complainants in the apartment immediately below, the officers concluded that the former was mentally ill and involuntarily took her into custody for a psychological evaluation. Id., at 964. The plaintiff was released after the physician whom examined her "found no sign of mental illness and released her." Id. In the meantime, the source of the commotion was discovered to have been in the apartment below the complainant's apartment. One witness testified that, before the officers detained the plaintiff, he had told one of the officers that the noise was coming from the apartment that it, in-fact, was coming from; there was no evidence that the officers acted on that information. This Court reversed the District Court's denial of qualified immunity, finding that the detaining officers' actions were objectively reasonable "in light of the information they possessed" because "the costs of inaction" were too high. Id., at 966-67.

There are situations in which the objective reasonableness of an officer's actions is a question of fact for the jury. In

Rainey v. Conerly, the defendant-officer used substantial force in removing an uncooperative prisoner from a vestibule, located between two doors, into a corridor away from the cell block. 973 F.2d 321, 323 (4th Cir. 1992). The plaintiff-prisoner testified that the officer "lost his temper," dragging him from the vestibule and slamming against the wall three times. The defendant-officer testified that he came into the vestibule because he was concerned about the prisoner's actions inciting a large group of prisoners that had gathered at the open door to the cell block and, moreover, he only removed the prisoner from the vestibule and accidentally fell on him in that act. Id. This Court held that the officer was not entitled to qualified immunity because:

> [The officer did] not claim, as did the officers in Gooden, that he operated under a mistaken, but reasonable perception of the facts. Instead, the crux of the dispute revolves entirely around the level of force utilized by [the officer] in removing [the plaintiff] from the vestibule. If [the prisoner's] version of the facts is credited, then [the officer's] actions could not, by any reasonable officer, be considered to be within the bounds of the law.

<u>Id</u>., at 324. Thus, "a determination of what actually happened [was] absolutely necessary to decide whether [the officer] could reasonably believed his actions were lawful." <u>Id</u>.

Indeed, in this case, the District Court cites to a more recent decision from this Court, which held-- under a similar rationale as <u>Rainey</u>-- that there was no qualified immunity available to a pair of officers that fired on an armed man. J.A., 390; <u>Pena v. Porter</u>, 316 Fed.Appx. 303 (4th Cir. 2009).

In <u>Pena</u>, there were two categorically divergent stories as to what occurred on the night in question. The officers claimed that they knocked on the plaintiff's door, he answered with a rifle in his hand pointed downward, all but one of the officers retreated, all officers ordered him to drop the weapon several times, and instead of complying, the plaintiff "shoulder[ed] his gun." <u>Id</u>., at 308. However, according to the plaintiff, he "was not aroused by the knocking on the door and window but rather by the sound of his dogs and chickens," he had no idea the police were at his door when he opened it, and that "the Officers immediately opened fire on him, without giving any warning or instructions." <u>Id</u>. This Court affirmed the denial of qualified immunity in that case because, the officers asserted that, even accepting the plaintiff's version of the

facts as true, their "use of force was reasonable simply because Pena was carrying a gun." Id., at 311.

Here, the District Court quotes in its Order the Pena Court's response to that assertion: "police do not have the unfettered authority to shoot any member of the public carrying a gun or other weapon." While this proposition is undoubtedly true, the District Court errs on relying on it here because that is not what the evidence-- even drawn in a light most favorable to the plaintiff-- suggests happened in this case. In this case, there is no similar material determination to be made as to what actually happened; only a debate as to the reasonableness of the depth perception of the officer in the tense moments during the exchange. That is a matter this Court may conclude upon a matter of law, as it did in Anderson, Slattery, Gooden, and-- as discussed extensively *supra*-- in Sigman.

Even assuming that Officer Wilson misperceived the proximity of Plaintiff-Appellee by approximately five yards, there is no evidence in the record that this perception was objectively unreasonable. As the above-discussed cases illustrate, Plaintiff is not entitled to the presumption that, because the Court must assume here that Officer Wilson's perception was incorrect, that it was necessarily unreasonable.

33

As Officer Wilson's perception was *reasonable though putatively erroneous*, so follows a conclusion that the use of force was reasonable as a matter of law, under this Court's holding in Sigman, given the materially similar circumstances confronting him in the tense moments on the night in question. Therefore, the District Court erred in concluding that Defendant-Appellant is not entitled to qualified immunity in this case. This Court should reverse on the basis that Defendant-Appellant's use of force was objectively reasonable as a matter of law.

**IV. Defendant-Appellant's conduct was objectively reasonable in view of the lack of clearly established law as to the specific, relevant, and particularized right in question.**

Independent of whether Officer Wilson's use of force was objectively unreasonable as a matter of law, the Court should also conclude that his "conduct was objectively reasonable in view of the clearly established law at the time of the alleged event." Hill v. Crum, 727 F.3d 312, 321 (2013). "For a right to be 'clearly established,' in a qualified immunity case, 'the contours of the right must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right.'" Id., *quoting*, Wilson v. Layne, 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). The purpose

34

for this prong of qualified immunity is to protect government
officials from liability anytime they make a reasonable mistake
of law in the undertaking of their discretionary duties.

Moreover, generalizing rights under the Fourth Amendment is
achievable in almost any section 1983 claim brought under its
umbrella of protection. "It could plausibly be asserted that
any violation of the Fourth Amendment is 'clearly established,'
since it is clearly established that the protections of the
Fourth Amendment apply to the actions of police." Wilson, 526
U.S. 603, 615.

When examining whether a right has been clearly
established, the Court "ha[s] long held that it is case law from
this Circuit and the Supreme Court that provide notice of
whether a right is clearly established."[2] Hill, 727 F.3d at 322.
For a plaintiff to overcome a defendant-officer's qualified
immunity defense in an excessive force case, there must have
been particularized clarity of the specific right at the time
the incident underlying the lawsuit occurred. *See*, Brosseau v.
Haugen, 543 U.S. 194, 199, 125 S.Ct. 596, 160 L.Ed.2d 583
(2004).

---

[2] The Court in Hill also notes in the same paragraph that case
law from "the highest court of the state in which the cases
arose" will also be relevant to the inquiry. Id.

In Brosseau, a police officer used deadly force when confronted with a suspect at the scene of a violent crime, who was believed to be armed, and was fleeing the scene in a motor vehicle. 543 U.S. 194, 196-97. In holding that the officer was entitled to qualified immunity from the resultant excessive force claim, the Supreme Court stated: "It is important to emphasize that this inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." 543 U.S. 194, 198.

As an excessive force case, the parties in Brosseau relied heavily upon two seminal cases governing excessive force cases brought under 42 U.S.C. s 1983 in order to properly navigate the relevant standards of law. See, Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); Tennessee v. Garner, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). However, the Court in Brosseau cautions against relying upon these cases to define a 'clearly established right' in assessing whether an officer is entitled to qualified immunity in any but the most obvious of excessive force cases:

> Graham and Connor, following the lead of the Fourth
> Amendment's text, are cast at a high level of generality.
> Of course, in an obvious case, these standards can 'clearly

36

establish' the answer, even without a body of relevant case law.

543 U.S. 194, 199 (internal citations and quotations omitted).

After concluding that Graham and Garner were too generalized to yield a 'clearly established' right in a 'gray area' excessive force case, the Court in Brosseau "turn[ed] to ask" what-- if any-- case law was relevant to the situation that the officer was confronting. Id. Specifically, the Court asked what case law was available to notify an officer "whether [it was constitutional] to shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight." Id., at 200. Only a few cases were located by the parties that were relevant to the case before the Court-- two by the defendant-officer and one by the plaintiff. "None of them squarely governs the case here; they do suggest that Brosseau's actions fell in the hazy border between excessive and acceptable force. The cases by no means 'clearly establish' that Brosseau's conduct violated the Fourth Amendment." Id., at 201.

In the case *sub judice*, the District Court defines the right at stake at too high a level of generality:

37

> Clearly, using deadly force to stop a suspect who is armed, but does not pose an imminent deadly threat of severe bodily harm or death to an officer or others, is objectively unreasonable in an excessive force context.

J.A., 389. Besides noting that Plaintiff-Appellee was armed during the confrontation, the District Court otherwise paraphrases the broad Fourth Amendment right to be free from the unreasonable use of force, as articulated in Graham-- "...whether the suspect poses an immediate threat to the safety of the officers or others..." 490 U.S. 386, 396, and in Garner-- "probable cause to believe that the suspect poses a threat of serious physical harm either to the officer or others," 471 U.S. 1, 11. In other words, the District Court broadly construed the constitutional right in question to be that of the general Fourth Amendment right to be free from excessive force. However, under Brosseau, the District Court erred by not identifying a more particularized right in question. Therefore, its conclusion that the right at stake was clearly established is based on an erroneous premise.

Officer Wilson was confronted with making a decision in mere moments over whether to shoot a non-compliant individual, holding a knife, verbalizing aggression while approaching him and a stabbing victim. Officer Wilson concluded that Plaintiff-

Appellee was an imminent threat to him and others in the context of the rapidly evolving and chaotic fact pattern unfolding before him. No case law from the U.S. Supreme Court, the Fourth Circuit Court of Appeals, or the North Carolina Supreme Court clearly establishes the constitutional right of the above-described suspect to *not* have deadly force used upon him in those circumstances.

Concluding its analysis on the clearly established right at stake in this case, the District Court cites to <u>Jones v. Buchanan</u>, 325 F.3d 520, 527 (4th Cir. 2003) and <u>Bailey v. Kennedy</u>, 349 F.3d 731, 743 (4th Cir. 2003). *See*, J.A., 389. While both of these cases discuss excessive force jurisprudence generally, neither cases are similar in kind to the case at bar.

In <u>Jones</u>, the plaintiff was "neither armed nor suspected of being armed." 325 F.3d at 528. After a day of drinking whiskey, he had called the sheriff's office to pick him up and take him to jail so that he could become sober before having to make a court appearance the next morning. <u>Id</u>., at 523.

> While there, although admittedly drunk, using foul language, and starting to stand up, he was unarmed, locked in a room by himself, and handcuffed with his wrists behind his back. Nevertheless, in order to quiet him down so that three college students could pass through the room for

39

routine, non-emergency purposes, Deputy Keller knocked Jones to the floor and then jumped on him, crushing his nose, lacerating his nose and lips, and bruising his ribs.

325 F.3d at 531. The Court, in a divided opinion, declined to grant the defendant-officer qualified immunity. In its analysis, while starting with Graham, the majority opinion examined several cases from this Circuit, and even outside the Circuit, in concluding that the particularized right at stake in that case was clearly established: "Both before and after [the date of the underlying incident], courts have consistently applied the Graham holding and have consistently held that officers using unnecessary, gratuitous, and disproportionate force to seize a secured, unarmed citizen, do not act in an objectively reasonable manner and, thus, are not entitled to qualified immunity. So it is here." Id., at 532.

Similarly, in Bailey, the plaintiff was neither armed nor suspected of being armed at the time of the use of force. 349 F.3d 731, 739. Though the plaintiff at first resisted (an unlawful) arrest, after gaining control of the plaintiff, "[t]he officers continued to use force after Michael's hands were bound behind his back, his feet were bound, and he was lying face down on the floor." Id., at 744. Quoting Jones, the Court in Bailey then largely adopts the same case analysis as conducted in

40

<u>Jones</u>, regarding the rights of restrained unarmed individuals in police custody.  349 F.3d at 744-45.

In the case at bar, the District Court does not engage in a similar analysis of case law when defining the right at stake here.  Nor are the facts of <u>Jones</u> and <u>Bailey</u> substantially similar to the facts confronting Officer Wilson on the night in question so as to have put him on notice that his conduct would be proscribed.  As such, the majority opinion in <u>Jones</u> and the holding in <u>Bailey</u> cannot be held out as clear standards by which Defendant-Appellant can reasonably be expected to have informed his conduct on the night in question.

Though the District Court disputes the relevancy of <u>Sigman v. Town of Chapel Hill</u>, 161 F.3d 782 (4th Cir. 1998) (discussed *supra*), to the instant case, it is the only controlling case that applies excessive force jurisprudence to a substantially similar factual scenario to the circumstances confronted by Officer Wilson.  As this case was extensively discussed above, there is no need for duplication here.  However, briefly, the Court there decided that the defendant-officer was entitled to qualified immunity because-- just as Officer Wilson in this case-- he was confronted with an armed-- or recently armed-- individual, exhibiting non-compliant and aggressive behavior.

41

Even if <u>Sigman</u> is sufficiently distinguishable from the case at bar, there are no other cases from which Officer Wilson can reasonably be expected to have informed his decision-making in the particularized, specific, and relevant context of the circumstances confronting him when he encountered the armed and non-complaint Plaintiff-Appellee. As such, Officer Wilson's conduct could not have been objectively unreasonable given the clearly established law at the time of the incident. Therefore, the Court should hold that he is entitled to qualified immunity on this prong alone, or in addition to the first prong discussed above.

## CONCLUSION

Based on the foregoing, Defendant-Appellant is entitled to qualified immunity in this case under either one or both of the prongs of the qualified immunity analysis. As such, Defendant-Appellant respectfully requests that the Court reverse the District Court's Order from August 12, 2013, denying Defendant-Appellant's Renewed Motion for Judgment as a Matter of Law and enter judgment in Defendant-Appellant's favor.

Respectfully submitted, this the 31st day of October, 2013.

OFFICE OF THE CITY ATTORNEY

/s Daniel E. Peterson

Daniel E. Peterson
N.C. Bar #41521
Assistant City Attorney
600 E. Fourth Street
Charlotte, North Carolina 28202-
2841
dpeterson@charlottenc.gov

  Mark Newbold

Mark Newbold
N.C. Bar # 26296
Deputy City Attorney – Police
601 East Trade Street
Charlotte, North Carolina  28202
mnewbold@cmpd.org

 R. Harcourt Fulton

R. Harcourt Fulton
N.C. Bar # 24984
Senior Assistant City Attorney
600 E. Fourth Street
Charlotte, North Carolina 28202-
2841
cfulton@ci.charlotte.nc.us

***Attorneys for Defendant-Appellant***

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1. This brief complies with the Type-volume limitation of Fed. R. App. 32(a)(7)(B) because:

   The word count of this brief is <u>8, 832</u>.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   This brief has been prepared in a proportionally spaced typeface using
   <u>Microsoft Word, Courier New, 12 point</u>.

October 31, 2013

OFFICE OF THE CITY ATTORNEY

/s Daniel E. Peterson
_____

Daniel E. Peterson
N.C. Bar #41521
Assistant City Attorney
600 E. Fourth Street
Charlotte, North Carolina 28202-2841
dpeterson@charlottenc.gov
***Attorney for Defendant-Appellant***

44

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that the foregoing document was served via the ECF system to Plaintiff's counsel:

Fred W. DeVore, III
F. William DeVore, IV
DeVore Acton & Stafford, PA
438 Queens Road
Charlotte, NC  28207
fdevore@devact.com
will@devact.com

This, the 31st day of October, 2013.

OFFICE OF THE CITY ATTORNEY

/s Daniel E. Peterson

Daniel E. Peterson
N.C. Bar #41521
Assistant City Attorney
600 E. Fourth Street
Charlotte, North Carolina 28202-2841
dpeterson@charlottenc.gov
***Attorney for Defendant-Appellant***

45